IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TIMOTHY MONTILEONE,<br>RICK A. FIRMAND, THOMAS W.<br>FURLONG, JR., KEVIN BLADOW, and<br>CLAYTON THYGERSON. | ) | |
| | ) | |
| Individually and on behalf of all others<br>similarly situated others | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | Case Number: 3:13-CV-01217-JPG-SCW |
| | ) | |
| AAMCO TRANSMISSIONS, INC., | ) | |
| (Serve: Registered Agent | ) | JURY TRIAL DEMANDED |
| 201 Gibraltar Road | ) | |
| Horsham, PA  19044) | ) | |
| | ) | |
| And | ) | |
| | ) | |
| AMERICAN CAPITAL, LTD | ) | |
| (Serve: Registered Agent, Samuel S. Flax, | ) | |
| 2 Bethesda Metro Center | ) | |
| 14th Floor | ) | |
| Bethesda, MD  20814) | ) | |
| | ) | |
| And | ) | |
| | ) | |
| AMERICAN DRIVELINE SYSTEMS, INC) | | |
| (Serve: National Corporate Research, LTD | ) | |
| 615 S Dupont Highway | ) | |
| Dover, DE  19901) | ) | |
| | ) | |
| And | ) | |
| | ) | |
| AMERICAN DRIVELINE CENTERS, INC.) | | |
| (Serve: National Corporate Research, LTD | ) | |
| 615 S Dupont Highway | ) | |
| Dover, DE  19901) | ) | |
| | ) | |
| And | ) | |

MALON WILKUS,            )
(Serve: 2 Bethesda Metro Center  )
     14th Floor          )
     Bethesda, MD  20814)

And

BRET BERO,
(Serve: 2 Bethesda Metro Center
     14th Floor
     Bethesda, MD  20814)

And

MARC GRAHAM,
(Serve: 201 Gibraltar Road
     Horsham, PA  19044)

And

MIKE SUMSKY,
(Serve: 201 Gibraltar Road
     Horsham, PA  19044)

And

BRIAN O'DONNELL,
(Serve: 201 Gibraltar Road
     Horsham, PA  19044)

And

TODD LEFF,
(Serve: 200 Horizon Drive, Suite 203
     Hamilton, NJ  08691)

And

KEITH MORGAN,
(Serve: 339 W. Lancaster Ave
     Haverford, PA  19041)

     Defendants.

## COMPLAINT

COMES NOW, Timothy Montileone, Rick A. Firmand, Thomas W. Furlong, Jr., Kevin Bladow, Clayton Thygerson, and Marjorie Stafford, individually and on behalf of a class of similarly situated others (hereinafter collectively referred to as "Plaintiffs"), by and through counsel, and for their causes of action against all Defendants, state and allege as follows based upon personal knowledge as to their own acts and, as to all other allegations, upon information and belief, and investigation by counsel:

## PARTIES

1.  Plaintiff Timothy Montileone is a citizen and resident of the State of Missouri.  That at all times relevant herein, Plaintiff owned and operated an AAMCO franchise.

2.  Plaintiff Rick Firmand is a citizen and resident of the State of Missouri.  That at all times relevant herein, Plaintiff owned and operated an AAMCO franchise.

3.  Plaintiff Thomas W. Furlong, Jr. is a citizen and resident of the State of Maryland.  That at all times relevant herein, Plaintiff owned and operated an AAMCO franchise.

4.  Plaintiff Kevin Bladow is a citizen and resident of the State of California.  That at all times relevant herein, Plaintiff owned and operated an AAMCO franchise.

5.  Plaintiff Clayton Thygerson is a citizen and resident of the State of Colorado.  That at all times relevant herein, Plaintiff owned and operated an AAMCO franchise.

6.  Plaintiffs, collectively on behalf of themselves and others similarly situated, are, hereinafter, referred to as "FRANCHISEES."

7.  This is a class action that the above named Plaintiffs bring on behalf of themselves and on behalf of all others similarly situated in the United States of America who purchased an AAMCO franchise(s).

8.    Defendant AAMCO Transmissions, Inc., ("ATI"), is a Pennsylvania corporation, established on November 6, 1963, and maintains its principal place of business in Horsham, Pennsylvania.  ATI is the franchisor of a national network of automotive service centers.

9.    Defendant American Driveline Systems, Inc., ("ADS") is a corporation organized and existing under the laws of the State of Delaware; That ATI is a subsidiary of ADS;  That, further, the majority owner of the shares of ADS is American Capital, LTD, as set forth below.

10.   Defendant American Driveline Centers, Inc., ("ADC") is a corporation organized and existing under the laws of the State of Pennsylvania; ADC is an affiliate of ATI and used for the purpose of owning corporate AAMCO centers; That ADC was previously known as Cottman Transmission Centers, Inc. until July of 2006, when an amendment was filed with the State of Pennsylvania.

11.   Defendant American Capital, LTD is a regulated investment corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Bethesda, Maryland.  American Capital, LTD is a publicly-traded business development company and global asset manager. American Capital, LTD is the majority owner of ADS and four employees of American Capital, LTD are on the six-person Board of Directors that is common to both ATI and ADS.  American Capital, LTD is hereinafter referred to as "American Capital".

12.   Defendant BRET BERO (hereafter referred to as "BERO") is, upon information and belief, a citizen and resident of the State of Massachusetts. Defendant BERO joined American Capital, Ltd. as a Vice President in May 2007 and was promoted to Principal in

2009. BERO has served as the interim CEO and COO of several American Capital portfolio companies including ADS and ATI.

13.     Defendant MALON WILKUS (hereafter referred to as "WILKUS") is, upon information and belief, a citizen and resident of the State of Maryland. Defendant WILKUS is the founder, Chairman, and CEO of American Capital, Ltd., who, at all times relevant herein, actively participated in the conduct of the enterprise as set forth in this Complaint.

14.     Defendant MARC GRAHAM, (hereafter referred to as "GRAHAM") is, upon information and belief, a citizen and resident of the State of California.  That at all time relevant herein, defendant GRAHAM was appointed President and CEO of AAMCO and American Driveline in September 2009. GRAHAM joined the Board of Directors of AAMCO in March 2006. In December 2011, GRAHAM was appointed Chairman of the Board of Directors of ADL and AAMCO.   Upon information and belief, in or about February of 2013, GRAHAM voluntarily resigned on or was asked to resign by the Board of Directors of ADL.

15.     Defendant MICHAEL SUMSKY, (hereafter referred to as "SUMSKY") is, upon information and belief, a citizen and resident of the State of Pennsylvania.  Defendant SUMSKY joined AAMCO in June 2006 as Vice President of Finance-CFO. SUMSKY serves as Secretary of AAMCO, ADL, and Cottman, positions he has held since September 2006.  In addition, SUMSKY serves as President of ATI's undisclosed subsidiary, ADC.

16.     Defendant BRIAN O'DONNELL (hereafter referred to as O'DONNELL) is, upon information and belief, a citizen and resident of the State of Pennsylvania. That at all time relevant herein, Defendant O'DONNELL served as Senior Vice President of Operations

for AAMCO. O'DONNELL started with AAMCO in January 1985 as a Field Operations Manager. From May 1988 until June 1992, O'DONNELL was Director of Operations. O'DONNELL became Vice President of Operations in June 1992 and continued in that position until 1997 when he was appointed Senior Vice President of Operations.

17. Defendant TODD LEFF (hereafter referred to as "LEFF) is, upon information and belief, a resident of the State of Pennsylvania. Defendant LEFF was President and CEO of AAMCO from March of 2006 until April of 2009 and led the merger of Cottman Transmissions and AAMCO.

18. Defendant KEITH MORGAN (hereafter referred to as "MORGAN") is, upon information and belief, a resident of the State of Pennsylvania. Defendant MORGAN was the son of Robert Morgan, co-founder of AAMCO, and served as CEO from 1992 until he sold AAMCO in 2006.

19. In this complaint, the term "AAMCO" refers to the web of affiliated companies, corporations, limited liability companies, the franchisor, and their employees, representatives, and/or agents, that acting together or separately, control and/or manage and/or assist the business of the AAMCO franchise system.

20. In this complaint, the term "FRANCHISOR" refers to Defendant ATI.

21. In this complaint, Defendants Marc Graham, Michael Sumsky, Brian O'Donnell, Bret Bero, Malon Wilkus, Todd Leff, and Keith Morgan are hereinafter collectively referred to as "CORPORATE REPRESENTATIVES."

22. Plaintiffs have further information and belief that more discovery in this complaint will lead to additional CORPORATE REPRESENTATIVES.

23.     All Defendants are associated with the RICO Enterprise alleged herein and conducted

and participated in, directly and/or indirectly, the conduct of the RICO Enterprise's

affairs.

### NATURE OF THE CASE:

24.     This is a class action brought by franchisees of the AAMCO franchise system

(hereinafter referred to as "AAMCO") arising from the illegal business scheme of

AAMCO and its web of affiliated entities and individuals who control and operate

AAMCO (collectively, all the Defendants).  Through this scheme, Defendants

fraudulently induced Plaintiffs and the Class to purchase a franchise and/or continue to

operate their franchise, and thereafter exploited their control and economic power in

order to extract exorbitant and unjustifiable payments and expenditures from their

franchisees.  As a result, Defendants reap grossly inflated sales and profits, creating an

illusion of corporate growth and business prosperity while causing substantial,

permanent, irreparable financial harm to the franchisees.

25.     AAMCO's illegal scheme consists of two primary components.  First, AAMCO engages

in a policy of fraudulently and deceptively inducing franchisees to purchase AAMCO

franchises by intentionally misrepresenting the true nature of the contractual relationship

as well as the financial prospects for the franchisee and their likelihood of success.

Second, AAMCO further takes advantage of its franchisees through other illegal,

deceptive and fraudulent means, including but not limited to its willful practice of: (a)

teaching and encouraging franchisees to engage in fraudulent and deceptive business

practices in order to reap profits (b)deceptively churning franchise locations between the

franchisees, and (c) charging illegal, undisclosed, inflated fees/charges to the franchisees

in order to reduce the franchisees' income and increase the Defendants' profits.

26. When the inevitable failures of franchisees throughout the system come to pass, Defendants suffer no loss.  Defendants merely step in and take control of the center. Defendants utilize "Floaters" to fraudulently inflate the numbers through means which are questionable, to say the least.  By inflating the numbers, Defendants are now able to churn the franchise and obtain additional, unwarranted franchise fees.

27. The harm to the franchisee is obvious: complete financial devastation.  Of the ATI franchisees that use SBA financing, at least 39% are in default.  That is an astounding figure and further evidence of the failure of the system.

28. Plaintiffs bring this action alleging violations of the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. § 1962(c).  Plaintiffs seek damages to remedy Defendants' unconscionable, fraudulent, and unlawful practices in connection with the operation of its franchise scheme.

<u>The Inception of AAMCO</u>

29. Robert Morgan founded AAMCO in 1963 after identifying a need in the automotive services industry and developing a business model specializing in repairing automatic transmissions.

30. The transmission is a complex part of an automobile that contains everything from mechanical systems, electrical systems, computer controls and hydraulic systems.  It is also one of the most expensive parts to repair.

31. A transmission overhaul can be done in two ways, a rebuild, which is the process of rebuilding the transmission in the vehicle, or a remanufactured, which is the process of replacing the bad transmission with one that was rebuilt by an outside vendor.

32.   Rebuilding a transmission involves the disassembly of the transmission, the internal inspection, the replacement of parts that have been worn or damaged, reassembly and then reinstallation into the vehicle.  Rebuilds require a highly-skilled transmission technician.

33.   A remanufactured transmission is rebuilt by someone else at a different location.

34.   While the retail costs of both transmission overhauls are comparable, the profit margins for the rebuilds are much higher.  Therefore, without an experienced, qualified transmission rebuilder, a transmission repair business is severely handicapped.

35.   Potential franchisees are led to believe, that with the help of AAMCO, finding a qualified transmission rebuilder will be simple such that the majority of their work will be the more profitable rebuilds.

36.   When in fact, the majority of franchisees cannot obtain qualified transmission rebuilders and are forced to use remanufactured transmission, severely cutting their potential profits.

37.   Since its inception, AAMCO has been engaged in the sale of franchises to operate AAMCO service centers that specialize in the repair of automotive transmissions.  Only recently did AAMCO branch out to complete car care service.

38.   In 1992, Robert's son, defendant MORGAN, took over the company as CEO.

39.   In 2005, Robert Morgan passed away and the family sold the company in March of 2006 to American Capital which already owned their then longtime rival Cottman Transmission.

40.   Upon information and belief, the original goal of American Capital was to merge Cottman and AAMCO as one complete car care company operating under the brand name of AAMCO.  After attempting to transfer all Cottman franchises to AAMCO and

meeting some resistance, American Capital ceased forcing Cottman franchisees to change to AAMCO and currently holds two distinct entities operating in competition with each other under ADS.

41.     Since its inception, AAMCO has published UFOC/FDDs that make false representations and illusions to prospective franchisees and fraudulently omit material information. Their goal is to coerce prospective franchisees to invest in an AAMCO franchise.

42.     AAMCO transmitted by interstate wire and/or through the U.S. mail fraudulent UFOC/FDDs to numerous prospective and actual franchisees for the purpose of fraudulently inducing them to invest in an AAMCO franchise.

43.     AAMCO transmitted by World Wide Web/Internet to numerous prospective and actual franchisees fraudulent and deceptive information for the purpose of fraudulently inducing them to invest in an AAMCO franchise.

<strong><u>The Franchisee Lure</u></strong>

44.     AAMCO starts luring investors to its door with potential profit and earnings claims along with promises to provide, including but not limited to:

   a.     Financing for qualified candidates

   b.     Real estate support

   c.     Opening support and GOOD training

   d.     Corporate training

   e.     Recruiting support

   f.     Operational support

   g.     Technical support

   h.     Traditional and online marketing

      i.       Customer loyalty and retention

      j.       National fleet accounts

      k.       National purchasing program

      l.       Recession resistant business; and

      m.       Reasonable business hours

45.     AAMCO further boasts that the investor does not need any automotive experience.

46.     AAMCO flaunts itself as the world's largest franchise system of transmission specialists. A continued rapid increase in the number of AAMCO franchises sold is an important element in AAMCO's strategy of continuing to experience substantial growth in revenues.

47.     Once on the hook, AAMCO uses select franchisees to promote the franchise system when, in fact, such franchisees are merely corporate puppets.

48.     AAMCO then reels the new franchisees into unconscionable and burdensome franchise agreements.  It engages in a policy whereby it accepts substantial payments from potential franchisees, in exchange for the right to operate an AAMCO franchise that AAMCO knows or should reasonably know will, in all likelihood, fail.

49.     At the same time, AAMCO was inducing Plaintiffs and other to invest in its franchise system, it concealed the fact that the company was unable to support the system and in order to be successful in the system the franchisees must deceive the consumer.

50.     AAMCO's misleading and deceptive franchise agreements purport, among many other things, to give AAMCO unilateral control over all significant aspects of franchisee operations and to disclaim any responsibility for the effect of AAMCO's decisions and actions on the franchisees' viability.

51.     The franchisee quickly discovers in training that the AAMCO system is based on defrauding the consumers.

52.     Unfortunately, by the time the franchisee realizes this, he or she is already ensnared in the AAMCO net.

53.     The franchisee is then left with the two choices:  (1) operate an honest business which will ultimately fail, or (2) use the deceptive practices taught to franchisees by AAMCO. Not an easy choice for a franchisee faced with losing everything.

54.     AAMCO creates an environment where franchisees and their invested capital are preyed upon as the most important, immediate and dependable source of revenue and cash flow for the Franchisor, with little concern demonstrated by the Franchisor regarding the franchisees' positive cash flow.

55.     Defendants engaged in the practice of churning franchisees.

56.     The term "churning" refers to a practice in which the Franchisor does the absolute minimum to comply with its obligations under the Franchise Agreement while forcing the Franchisee to take some action to excuse any non-performance by the Franchisor.  Once that occurs, Franchisor can remove an existing Franchisee from a location and place a new Franchisee in that location.  The same scheme is used with the new Franchisee and the cycle continues.  The scheme allows the Franchisor to sell as many franchises as it can to increase its revenue stream.

57.     As soon as a franchisee begins to struggle and starts looking to get out of the AAMCO net, AAMCO swoops in and threatens the franchisee with legal action and conveniently offers to "help" the franchisee out by selling his location.

58.   AAMCO then uses Take Over Specialists, also known as "Floaters," 1099 independent
      contractors hired by the franchisor, to go to the struggling franchise location and increase
      sales revenues so that the franchise location can be sold to another new franchisee.  The
      Floater operates the location strictly by the script given to him by AAMCO.  The script
      involved using fraudulent methods to increase sales revenues.  The Floater was
      compensated by AAMCO and also given an incentive bonus of 10% of the sale price if
      he could turn it around so it could be sold.

59.   By using this system, AAMCO avoids having to disclose franchise failures.  In addition,
      AAMCO uses the sale as an opportunity to bind the seller to an unconscionable
      Settlement and Release Agreement in which, as a condition of the sale being approved,
      the seller must waive all rights to make claims against the franchisor under any
      circumstances.

60.   By using this scheme, AAMCO has fraudulently induced most struggling Franchisees
      into Settlement and Release Agreements in order to be relieved of their financial burden
      caused by AAMCO.

61.   Moreover, once the franchisees become aware of this fraudulent scheme, the already-
      expended costs, onerous contractual provisions, and the fear of retaliation make it
      difficult, if not impossible, for the franchisee to bring an individual case against
      AAMCO, thus finding themselves robbed blind and in financial ruin.

## **PLAINTIFFS' STORIES**

62.   The following Plaintiffs stories are set forth in detail in order to expose the fraud which
      permeates the AAMCO franchise system and as further evidence of the predicate acts of
      RICO alleged in this complaint.

## <u>TIMOTHY MONTILEONE'S STORY</u>

63.     Timothy Montileone is a victim of AAMCO's fraudulent systems.

64.     Timothy Montileone became interested in purchasing an AAMCO franchise after retiring

early and looking to have something to invest in that would generate a revenue stream

65.     After researching AAMCO online, Mr. Montileone called AAMCO and was directed to a

sales representative who invited Mr. Montileone to "Discovery Day" in Horsham,

Pennsylvania.

66.     At "Discovery Day" Mr. Montileone was subjected to high-pressure sales tactics.

Several representations were made to Plaintiff including, but not limited to:

a.   That transmission repair was an area that benefited from a torn economy

b.   That the average age of a car on the road today is 10 years old

c.   That people are not buying new cars but choosing to fix their existing vehicles

d.   That GRAHAM had extensive experience and success with AAMCO

e.   That he could be an absentee owner

f.   That no automotive experience was necessary and actually was preferred

g.   That POS System was being implemented in the next 60 days;

h.   That he would receive extensive training, and

i.   That AAMCO would support him every step of the way

67.     After "Discovery Day" and based upon the foregoing representations, Plaintiff decided to

invest into AAMCO.

68.     He attended training in July of 2011 where, upon completion, he signed three franchise

agreements.

69.    One of the franchise agreements concerned a location in Maryland Heights, Missouri, which was previously owned by John Idle who wanted to retire.

70.    The second franchise location purchased by Plaintiff was in Brentwood, Missouri, which was sold by AAMCO after they took the franchise from Plaintiff, Rick A. Firmand. AAMCO told Plaintiff Montileone that Plaintiff Firmand failed because Firmand and his business partner didn't get along.

71.    The third franchise location purchased by Plaintiff Montileone was in Wentzville, Missouri, which was sold once again after AAMCO took the franchise from another franchisee.  AAMCO told Plaintiff Montileone that this franchisee had failed because he went bankrupt due to medical bills.

72.    On all three purchases, AAMCO repeatedly reassured Plaintiff that if he followed the AAMCO system success would be guaranteed.

73.    Prior to signing any franchise agreements, Plaintiff was told that the average franchise needed $10,000 a week to break even, which included $1,000 a week salary to the owner, and that would be easy for him to achieve.

74.    As soon as Plaintiff was "in the door," he quickly realized he was on his own and that several of the representations he had relied upon in making his decision to purchase his franchises were false.

75.    In addition, Plaintiff discovered that several material facts known by Defendants were not disclosed to Plaintiff prior to him executing the franchise agreements.  These materials facts include, but are not limited to, the following:

    a.   The difficulty of finding employees and transmission rebuilders

    b.   The high risk of theft

    c.  The fact that there were 2 AAMCO locations within 10 miles to the north and south of his Brentwood location.

76.    Plaintiff reached out to AAMCO many times for help.  Eventually, AAMCO told Mr. Montileone that the problems were with his manager.  AAMCO told him that they would send someone to show him that if their systems were followed, his locations could be profitable.

77.    Plaintiff was sent a floater who operated one of his stores for two weeks.  In the first week, the floater increased revenue to approximately $25,000 and the second week to approximately $17,000.  Prior to that time, the location had generated revenue of approximately $5,000-$6,000 a week.

78.    Plaintiff quickly realized that he had once again been duped.

79.    The floater did many things to increase the revenue but actually cut the profit and left in his wake several additional problems that Plaintiff was forced to resolve.

80.    The floater was able to raise the revenue by, including but not limited to, cutting the cost of repairs to customers dramatically, promising financing to consumers when work was completed, and giving parts/services away to consumer who purchased another part/service.

81.    Overall, Plaintiff has not received the support and assistance as promised by AAMCO and the system he actually purchased was far different than the system that was represented to him prior to the execution of his franchise agreements.

82.    As a direct and proximate result of the misrepresentations made by AAMCO, Plaintiff has lost in excess of $200,000 and such losses continue to accrue.

## **RICK A. FIRMAND'S STORY**

83.    Rick A. Firmand and his partner, Scott Trent, are two of the many victims of AAMCO's

       fraudulent system.

84.    Rick A. Firmand and Scott Trent purchased a Cottman franchise located at 9607

       Manchester Road, Rock Hill, MO 63119 in or about October of 2004 from the previous

       franchise owner, Jerry Gervais. Hereinafter referred to as the "Rock Hill location".

       (Exhibit 1 - Rick Firmand's Cottman Franchise Agreement – Rock Hill)

85.    The first year of business, Plaintiff lost approximately $35,000 and by the second year

       was closing the gap at a loss of $11,000.

86.    In early 2006, Plaintiff received an announcement that AAMCO bought out Cottman.

87.    Plaintiff's initial reaction to the AAMCO purchase was positive as he believed they

       would have a greater support system and a better recognized brand.

88.    It became quickly apparent to the Plaintiff that AAMCO's goal was to wipe out the

       Cottman brand completely either by closing the locations or turning them into AAMCO

       locations.

89.    In early 2007, an opportunity arose for Plaintiff to purchase another Cottman location

       approximately 5 miles away from their current Rock Hill location.  Plaintiff was told that

       he would not be able to purchase that location as a Cottman but could as an AAMCO.

       Rick A. Firmand and Scott Trent purchased an AAMCO franchise on or about February

       6, 2007 and were granted the right to operate an AAMCO Transmissions center at 8744

       Watson Road, Crestwood, MO  63119.  Hereinafter referred to as the "Crestwood

       location". (Exhibit 2 - Firmand AAMCO Franchise Agreement – Crestwood)

90.    About a year later Plaintiff was informed that an AAMCO location approximately 1.2

       miles away from his Cottman Rock Hill location was up for sale and was presented the

opportunity to merge his Cottman location with the AAMCO location down the road.  At this particular time, Plaintiff was in a lease for the Rock Hill location and had a significant portion of the lease remaining so Plaintiff refused.

91.   Then, in or about early 2009, Plaintiff was approached again by Brett Miller, the then-owner of the AAMCO location, to purchase the AAMCO location and merge his Cottman location.  Also about this time, Plaintiff received notice of an eminent domain pending for his Rock Hill location which ultimately released Plaintiff from his lease.

92.   During this time, Plaintiff was being encouraged by Brett Miller to merge the Cottman and AAMCO location and told by LEFF that he would not be allowed to walk away from the Cottman name.

93.   It quickly became apparent that Plaintiff would be left with no options regarding his Cottman Rock Hill location as the eminent domain would force him to relocate and Cottman refused to approve any new territories to relocate as all available territories were only available to AAMCO locations.

94.   As a result, Rick A. Firmand along with his partner Scott Trent, terminated the Cottman Rock Hill franchise and transferred to an AAMCO Franchise on or about January 21, 2009 and were granted the right to operate an AAMCO Transmissions center at 8500 Manchester Road, Brentwood, MO 63144.  Hereinafter referred to as the "Brentwood location". (Exhibit 3- Firmand Franchise Agreement – Brentwood)

95.   As a stipulation for the approval of the Brentwood location purchase, Plaintiff was required to sign a promissory note to Cottman for $42,300.

96.   On or about November 5, 2009, Cottman, the sister company of AAMCO under parent ADI, filed suit against Rick Firmand and Scott Trent for failure to pay the promissory

note executed on January 7, 2009 for the purchase of the Brentwood location. (Exhibit 4 - Cottman Transmission v Rick Firmand)

97.    Plaintiff continued to try everything to keep his investments afloat but, after several months of struggling, Plaintiff was left with no option but to cease doing business as AAMCO and stop the bleeding.

98.    Once Plaintiff notified AAMCO that he could no longer financially continue the franchises, AAMCO offered to send a "floater" in to help him in order to resell the locations.  Plaintiff refused.

99.    On or about March 21, 2011, Plaintiff was left with no options but to enter into a Termination and Release Agreement in order to avoid further threatened legal action against him.

100.   Upon information and belief, AAMCO decided to let the Crestwood location "die" and resell the Brentwood location for additional profits.  In order to make the Brentwood location appear as a better investment, AAMCO included in their Termination and Release Agreement the transfer of the debt of Brentwood location to the Crestwood location.  (Exhibit 5 - Firmand Termination and Release Agreement)

101.   That Plaintiff has lost an amount in excess of $400,000.00 and such loss was directly caused by the fraudulent activities of Defendants as set forth herein.

## THOMAS W. FURLONG'S STORY

102.   Thomas W. Furlong, Jr. is another victim of AAMCO's fraudulent scheme.

103.   Thomas W. Furlong, Jr. first became interested in owning an AAMCO franchise after using franchise sales organizations to help him find a franchise in which to invest.  After looking at a handful of franchises, Mr. Furlong decided he was most interested in an

AAMCO franchise as he grew up in the Philadelphia area and AAMCO's name recognition was solid in his area.

104.   Once AAMCO became aware of Mr. Furlong's interest, it aggressively pursued him as a franchisee.  Various representatives of AAMCO, including Barry Auchenbach, LEFF, Jack Bachinsky, John Conway and others, made several claims to Plaintiff including but not limited to, that AAMCO provided a solid support system and a proven system that would permit Plaintiff to draw a "comfortable" salary.

105.   After signing the franchise agreement, he received among many other things, insufficient training, several excessive fees, and none of the promised support.  In addition, AAMCO stole away one of Plaintiff's employees, a prized rebuilder, for their use. He was forced to close his franchise on or about January of 2012.

106.   After notifying AAMCO that he had no option but to close, AAMCO, once again, threatened the Plaintiff with legal action if he closed but did offer to "help" by sending in a floater by the name of Mark Testa to run up his sales numbers and resell his franchise to another investor.

107.   In the same meeting with GRAHAM and O'DONELL where he signed the final documents to sell his franchise, Plaintiff was offered a job with AAMCO.

108.   O'DONELL asked Plaintiff to go to struggling and/or closed AAMCO franchise locations and prepare the building to be resold.  Plaintiff's job duties included many tasks related to preparing the building for a "turnkey" resale, including but not limited to, painting the center, ensuring the correct signage was installed, ordering the needed equipment, and making sure the proper operating system was in place.

109.  In a need for a job/income, Plaintiff agreed to take the position as a 1099 independent contractor until he ceased working for AAMCO in late 2012.

110.  That Plaintiff has lost an amount in excess of $450,000.00 and such loss was directly caused by the fraudulent activities as set forth herein.

## KEVIN BLADOW'S STORY

111.  Kevin Bladow is yet another victim of AAMCO's fraudulent scheme.

112.  Kevin Bladow first became interested in owning an AAMCO franchise after using a franchise matching company/broker to help him find a franchise in which to invest.

113.  Sometime in July of 2008, Mr. Bladow became interested in the AAMCO franchise and proceeded to have discussions with Mr. Barry Auchenbach about his potential investment in AAMCO.

114.  Mr. Bladow was aggressively pursued by Mr. Auchenbach.  Mr. Auchenbach told Mr. Bladow that he had to sign quickly to take advantage of an equipment bonus.

115.  Mr. Bladow asked many questions of Mr. Auchenbach and contacted a few franchises around the country.  Mr. Bladow requested more California franchisees to speak with prior to purchasing his franchise but was deterred by Mr. Auchenbach to anyone but the franchisee he recommended Mr. Bladow speak with.  In addition, when Mr. Bladow told Mr. Auchenbach about some of the franchisees that he spoke to were not successful, Mr. Auchenbach assured him that it was only because they were not following the AAMCO system.

116.  In or about August of 2008, Mr. Bladow purchased and signed the franchise agreement for Morgan Hill area, CA, and purchased an additional territory license for Gilroy, CA. Mr. Bladow was also sold the purchase of the GOOD program after being told that it was

being made mandatory because they would provide an experience center manager to help

him staff and get his operations going.  In addition, Mr. Bladow purchased all of his

equipment after being told he would need all of it.  (Exhibit 6- Kevin Bladow's Franchise

Agreement and Exhibit 7 – Kevin Bladow's Franchise Disclosure Document)

117.   Plaintiff was unable to secure a location for his franchise in Morgan Hill, California until

August of 2009.

118.   In September of 2009, Plaintiff completed his training in Pennsylvania.

119.   He proceeded to have the grand opening for his franchise in December of 2009 where he

was supposed to have a qualified manager come to his location for the first 5 weeks to

help him get a head start through the GOOD program he purchased at an additional cost.

120.   The qualified manager he was sent by AAMCO was essentially useless and went missing

in week 4 of his support because he was arrested in Nevada for driving while intoxicated.

121.   After Plaintiff began operations, he discovered further fraud within the system.  Below

are key examples:

a.   Plaintiff was charged various fees by AAMCO.   Plaintiff's reasonable

requests for information on the charges were denied;

b.   Plaintiff was led to believe the ad pool fees were $600 per week when, in

fact, they were $875 per week;

c.   Plaintiff was overcharged for his signage.  Once again, his reasonable

request for supporting documents was denied;

d.   AAMCO, as a pattern and practice, improperly paid for work on national

fleet accounts to the detriment of the franchisee; and

e.   AAMCO increased the invoice amounts for initial equipment.

122.   In August of 2010, Mr. Bladow called John Baumgartner and Brian Joo to tell them that he was struggling and was not sure that he would be able to stay in business as he was only averaging $11,000 a week and his break-even was $13,500.  They told him that it was because his center manager did not know how to run things.

123.   Mr. Joo came to Plaintiff's center for a week to run it and was able to bring his sales up to about $19,000 for that week.  However, when Mr. Bladow later looked at the reports, he realized that a significant portion of that number was deposits on work that was not started which dramatically lowered the later sales numbers when the jobs were completed.

124.   In November of 2010, Mr. Bladow sent an email to John Baumgartner expressing his need to sell his location as he was continuing to lose money and could not afford to lose for much longer.  (Exhibit 8 – Email from Bladow to Baumgartner)

125.   Mr. Baumgartner encouraged Mr. Bladow to hang on a little longer.

126.   Mr. Bladow hung in there until April of 2011 when he called Mr. Joo, Mr. Baumgartner, and ODONNELL and told them that he could no longer make it and needed to sell since shutting down did not look like an option as he will lose everything.

127.   In or around July of 2011, ATI had listed his Gilroy territory for sale in a local paper.  When Mr. Bladow contacted ATI and told them that he had already paid for that zone, he was told they had no record of it but was later offered an extension on his purchase until December of 2011.

128.   At this time, Mr. Bladow was still continuing to try to salvage his investment and requested a refund of the territory fee paid for the Gilroy, CA area as he now knew the

market in CA would not support that territory either.  His request was denied.  Mr. Bladow tried to sell the territory but was unable to obtain a buyer.

129. In August of 2011, Plaintiff reached a selling agreement with another franchisee that ultimately fell through, resulting in AAMCO purchasing his Morgan Hill location back from Mr. Bladow for $75,000 plus his outstanding ad pool dues.

130. Plaintiff reluctantly signed the termination agreement as he was in duress and felt he was left with no option if he wanted out of the AAMCO web as he was being threatened legally and financially. (Exhibit 9 - Termination Agreement)

131. That Plaintiff has lost an approximate amount of $670,000.00 and such loss was directly caused by the fraudulent activity of Defendants as set forth herein.

## CLAYTON THYGERSON'S STORY

132. Plaintiff Clayton Thygerson is a current franchisee and victim of AAMCO.

133. In early 2002, Mr. Thygerson became interested in purchasing an AAMCO franchise because he wanted to be in a steady industry with security.

134. Prior to purchasing his AAMCO franchise, Mr. Thygerson was aggressively pursued by Steve Stovall.  Mr. Stovall led Plaintiff to believe that every AAMCO franchisee was successful and those that did go out of business failed to follow corporate directions, lost their lease, etc.  Mr. Stovall further told Plaintiff that he would get 85% of the business from everyday people and 15% from fleet accounts.

135. Prior to signing the franchise agreement, Mr. Stovall told Plaintiff that his breakeven point would be $12,400 a month and that Plaintiff should have no problem obtaining that.

136.   Prior to signing the franchise agreement, Mr. Stovall told Plaintiff that he would earn over $129,000 a year based on the amounts that particular location in Grand Junction was earning.

137.   Plaintiff received several additional representations from AAMCO that induced Mr. Thygerson into his purchase.  These representation include but are not limited to:

    a.   A profit projection that AAMCO provided to him prior to purchasing the location;

    b.   That he would need at least $30,000 in working capital but could make it with the $20,000 he had;

    c.   That he would receive opening and ongoing support;

    d.   That he would have success with the purchase of the GOOD program;

    e.   That the franchisor would provide operation and technical support; and

    f.   That no automotive experience was required and actually preferred.

138.   On November 15th, 2002, Mr. Thygerson purchased an existing AAMCO franchise in Grand Junction, Colorado and later found out that he was the fourth owner of the Grand Junction, Colorado location and the profit/sales numbers he received were inaccurate and misleading. (Exhibit 10 – Clayton Thygerson's Franchise Agreement)

139.   As soon as Mr. Thygerson was "in the door," he immediately started to struggle and quickly realized that he had been defrauded into his purchase.

140.   Over the years, Mr. Thygerson got behind on franchise fees and other various fees being continuously and erroneously charged to him.

141.   In 2007, AAMCO attempted to get Plaintiff to sign a new franchise agreement and franchise disclosure document as it had additional language that would entitle AAMCO to own several things including his telephone number should he default.

142.   Plaintiff refused to sign the new agreement as he knew his franchise would be churned as soon as he did.

143.   Plaintiff did sign an amendment to the agreement on June 22nd, 2007 to add an additional franchisee to the Franchise Agreement signed on November 15th, 2002. (Exhibit 11 – Amendment to Franchise Agreement)

144.   Over the years Plaintiff received many promising emails and emails that outlined the fraud he was wrapped up in from NADA, the National AAMCO Dealers Association ("NADA").

145.   In an email to Mr. Thygerson from Rick Bigham, Mr. Bigham provides Mr. Thygerson with an email Mr. Bigham sent to GRAHAM.  That email sets out many key point s discussed with GRAHAM and problems the AAMCO dealers as a whole are experiencing(Exhibit 12 – Email to Clayton Thygerson 8/30/2011)

146.   In an email dated September 27, 2011, Mr. Rick Bigham, Mr. Mike Ganjei, and an anonymous franchisee expressed some serious concerns regarding their franchisor. (Exhibit 13 – Email to Clayton Thygerson 9/27/2011)

147.   In the fall of 2011, Mr. Thygerson received a Franchise Issues Update newsletter from NADA, where several issues were once again expressed. (Exhibit 14 – Newsletter)

148.   Another example of problems within the AAMCO system was expressed in an email dated July 23, 2013 from Mr. Mike Ganjei to all AAMCO dealers.  (Exhibit 15 – Email to Clayton Thygerson 7/23/2013)

149. Plaintiff has been receiving emails like those attached as Exhibits 12-15 for several years. No issues have ever been truly resolved.

150. In 2007, after receiving inadequate support from AAMCO, Plaintiff hired an outside management company to come in and help him be successful. The management company provided Plaintiff with many helpful insights and instructions that helped Plaintiff become more successful and eventually break-even.

151. Ultimately, Plaintiff came to the realization that to have any chance of salvaging some of his investment he needed to separate from AAMCO.

152. In or about January 2013, Plaintiff cut off all communication with AAMCO.

153. In or about February of 2013, Plaintiff stopped answering the phone as AAMCO.

154. In or about September of 2013, Plaintiff removed all AAMCO signage, changed his name to Family Auto Care and Transmission, and started operating independent of AAMCO.

155. Plaintiff has not signed a termination agreement.

156. That Plaintiff has lost an amount in excess of $400,000.00 and such loss was directly caused by the fraudulent activities of Defendants as set forth herein.

## SUITS FILED BY FRANCHISEES AND AAMCO'S CORPORATE BULLYING

157. Attached as Exhibit 16 are various pages of litigation from AAMCO franchise disclosure documents that demonstrate the overwhelming corporate bullying tactics used by AAMCO to conceal the fraud of the system, to discourage franchisees from taking any action to hold the franchisor accountable, and to instill fear of retaliation into the franchisees.

158.  Also included in Exhibit 16 is litigation pursued by the few franchisees that had the courage and means to fight back against AAMCO and several state actions against

AAMCO as further evidence of the commonality of the claims of the class and AAMCO's fraudulent system.

## THE FTC RULE

159.   Promulgated on December 21, 1978, the FTC Rule is designed to require sellers of franchises like AAMCO TRANSMISSIONS, INC. to provide prospective investors with the information they need to make an informed investment decision.  The FTC Rule, found at 16 CFR Part 436,  permits Franchisors to use a uniform disclosure format which has been adopted by every state known as the "Franchise Disclosure Document" ("FDD"), formerly known as the "Uniform Franchise Offering Circular" ("UFOC").  Each topic of disclosure in the FDD is referred to as an "Item" numbered 1 to 23.  Some of the most basic Items are the following:

## FTC VIOLATIONS OF AAMCO

### Item 1

160.   Item 1 requires, *inter alia*, disclosure of the prior business experience of the franchisor and any predecessors or affiliates.  As far as affiliates, the franchisor is required to disclose the identity of any affiliates that offer franchises in any line of business or provide products or services to the franchisees of the franchisor.

161.   AAMCO misrepresents and omits matters of material fact in Item 1 of its FDD.

162.   Prior to an investigation and finding by the State of Washington, AAMCO failed to disclose that AMERICAN CAPITAL was a parent company.  (See Exhibit 17 , State of Washington v AAMCO)

163.   Starting in 2007, AAMCO began providing consolidated financials in its FDD which identified "AAMCO and Subsidiary" and later "AAMCO and Subsidiaries."  In Note 2 to

its Consolidated Financial Statements, the subsidiaries are identified as "Accel Advertising" and "AAMCO Canada, Inc." The initial consolidation of financial statements in 2007 resulted in an increase in revenue in excess of $10 million. However, nothing in Item 1 sets forth the identity of the subsidiaries nor the remaining information required to be disclosed concerning said subsidiaries.

164.   These misrepresentations were made to every potential franchisee at the time the FDD was forwarded through the mail or by wire.

165.   That failure of AAMCO to properly disclose the information as required in Item 1 is, per se, an unfair and deceptive trade practice.

<u>Item 4</u>

166.   <u>Item 4</u> requires the disclosure of whether the franchisor, any parent, predecessor, affiliate, officer or general partner of franchisor, or any other individual with management responsibility has within a ten year period filed as a debtor or had filed against it  a petition under the United States Bankruptcy Code, obtained a  discharge of its debts under the Bankruptcy Code, or was a principal officer of a company or a general partner in a partnership that either filed as a debtor or had filed against it a petition under the Bankruptcy Code while or within one year after the office or general partner held the position in the company.

167.   AAMCO misrepresents and omits matters of material fact in Item 4 of its FDD.

168.   AAMCO failed to disclose that GRAHAM was the former president of EZ Lube, LLC and that while he was President EZ Lube, LLC filed for bankruptcy in December of 2008. (See Exhibit 18 - State of Virginia v AAMCO Transmissions, Inc.)

169.   These misrepresentations were made to every potential franchisee at the time the FDD

was forwarded through the mail or by wire.

170.   The failure of AAMCO to properly disclose the information as required in Item 4 is, per se, an unfair and deceptive trade practice.

<u>Item 20</u>

171.   <u>Item 20</u> requires the franchisor to fully disclose information concerning its current and former franchisees, including the number of franchisees whose ownership was transferred or whose franchise was canceled, terminated, or not renewed or have ceased doing business in the system.  A pattern of abandonment, sales, terminations and non-renewals indicates a sick franchise.

172.   AAMCO, violated the FTC rule with regard to Item 20 of the FDD in that it failed to disclose that certain franchise locations contained in the FDD were closed, had never opened, or were resold, transferred or otherwise changed ownership.

173.   These misrepresentations were made to every potential franchisee at the time the FDD was forwarded through the mail or by wire.

174.   The aforesaid misrepresentations were made for the sole purpose of preventing potential franchisees from contacting dissatisfied former franchisees.

175.   The failure of AAMCO to accurately relay the information as required in Item 20 is, per se, an unfair and deceptive practice.

<u>Item 21</u>

176.   <u>Item 21</u> requires the franchisor and its subsidiaries to include audited financials according to United States Generally Accepted Accounting Principles.

177.   AAMCO has violated the FTC Rule with regards to Item 21 of the FDD in that it has provided consolidated financial statements which contain statements of income and

expenses which are inaccurate, false, and misrepresent the true financial condition of the franchisor.  Upon information and belief, AAMCO is currently conducting an audit to determine the extent of the misstatements contained in the financial statements previously provided in its FDDs and, as of this date, have not completed a 2013 FDD thereby rendering it unable to sell franchises.

178.  These misrepresentations were made to every potential franchisee at the time the FDD was forwarded through the mail or by wire.

179.  Filing consolidated financial statements which contain inaccurate and/or fraudulent information is, per se, an unlawful and deceptive trade practice.

The Timing of Federal Disclosure

180.  In addition to providing a format for disclosures, the FTC Rule specifies when a disclosure document must be given to the prospective franchisee.  Such timing requirements are intended to ensure that franchisees have a "cooling off" period in which to evaluate the disclosure document before paying any monies to the franchisor and before executing agreements binding on the prospective franchisee.

181.  Under the Rule, the prospective franchisee must be provided a disclosure document upon the *earliest* to occur of any of the following three events:

    a.    The first face to face meeting with a franchisee;

    b.    10 business days prior to the execution of a franchise agreement; or

    c.    10 business days prior to payment by a prospective franchisee.

182.  Violations of the FTC Rule are considered unfair or deceptive acts within the meaning of Subpart F of the Federal Trade Commission Act, 16 CFR Section 436.9.

JURISDICTION AND VENUE

183.   This Court has subject matter jurisdiction over this case pursuant to 18 U.S.C. § 1964(c) under the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO") claim.

184.   This court has subject matter jurisdiction over the Plaintiffs' claim brought under RICO pursuant to 28 U.S.C. § 1331.

185.   Venue is proper in this Court under 28 U.S.C. § 1391 (b) (2) because a substantial part of the events or omissions giving rise to the claims of the Plaintiffs occurred in this judicial district: ATI operates and does business in the Southern District of Illinois through franchisees.  A substantial part of the events giving rise to Plaintiffs' claims occurred in the Southern District of Illinois.

186.   Venue is also proper pursuant to the nationwide service of process and venue provisions under 18 U.S.C. § 1965.

## CLASS ACTION ALLEGATIONS

187.   This action may also properly be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b).

188.   Plaintiffs bring this action on behalf of themselves and all similarly situated others defined as:

*All AAMCO Transmissions, Inc. franchisees, who signed a franchise agreement with AAMCO Transmissions, Inc. and its predecessors, at any time prior January 1, 2007 and were still franchisees as of January 1, 2007 and/or all AAMCO Transmissions, Inc. franchisees who signed a franchise agreement any time after January 1st, 2007  to the present (the "Class"). The "Class Period" is from January 1, 2007 to the present.  Excluded from the Class are Defendants, as well as Defendants' employees, affiliates, officers, and directors and the Judge to whom this case is ultimately assigned.*

189.    Plaintiffs reserve the right to amend the definition of the Class if discovery and/or further

investigation reveal that the Class should be expanded or otherwise modified.

<u>Rule 23(a)</u>

190.    <u>Numerosity and Impracticality of Joinder</u>: The members of the Class are so numerous

that their individual joinder would be impractical. According to the 2012 FDD (Exhibit

19, Item 20) there were at least 773 current franchisees in their system at the end of 2011.

The precise identities, number and address of members of the Class are unknown to

Plaintiffs, but may and should be known with proper and full discovery of Defendants,

third parties, and their respective records.

191.    <u>Commonality and Predominance</u>: There is a well-defined commonality of interest and

common questions of law and fact that predominate over any questions affecting

individual members of the Class. These common legal and factual questions, which exist

without regard to the individual circumstances of any Class member, include, but are not

limited to, the following:

      a.    Whether and to what extent Defendants' practices, conducts, and

misrepresentations violate Federal law;

      b.    Whether Defendants have engaged in mail and wire fraud;

      c.    Whether it was reasonably foreseeable that misrepresentations by

AAMCO would be sent over interstate wires or mails;

      d.    Whether there were any misrepresentations by AAMCO sent across

interstate wires and mails for purposes of executing schemes to defraud;

e.      Whether AAMCO intentionally participates in schemes to defraud and use interstate wires in furtherance of the scheme in violation of 18 U.S.C. § 1343;

f.      Whether Defendants engaged in a pattern of racketeering activity;

g.      Whether the AAMCO franchise system is an enterprise within the meaning of 18 U.S.C. §1961(4);

h.      Whether Defendants conducted or participated in the affairs of the enterprise through a pattern of racketeering activity in violation of U.S.C. § 1962(c);

i.      Whether Defendants' overt and/or predicate acts in furtherance of the conspiracy and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to the Plaintiffs' and class members' business, economic, and property;

j.      Whether Defendants' affirmative statements and material omissions constitute intentional fraud;

k.      Whether AAMCO's FDD contained fraudulent misrepresentations and omissions;

l.      Whether Plaintiffs and Class Members are entitled to recover compensatory, exemplary, treble damages based on Defendants' fraudulent and illegal conduct and/or practices; and

m.      Whether Plaintiffs and Class Members are entitled to an award of reasonable attorneys' fees, prejudgment interest, and costs of suit.

The questions or law and fact common to all Class members predominate over any questions that may affect only individual Class members. A class action is a superior method of adjudicating the Class members' claims because individual actions would unnecessarily burden the Court and create the risk of inconsistent results.

192.   Typicality: The Plaintiffs' claims are typical of the Class in that Plaintiffs have a common origin and share common bases.  Plaintiffs and all putative Class members are or were franchisees operating under the AAMCO system and have lost monies by reason of the system-wide scheme by AAMCO to defraud and make misrepresentations to potential franchisees of the AAMCO system.   Their claims originate from the same illegal, fraudulent and confiscatory practices of the Defendants, and the Defendants act in the same way toward the Plaintiffs and the Class members.  If brought and prosecuted individually, the claims of each Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.  Plaintiffs have no interests that are antagonistic or adverse to the other Class members.

193.   Adequacy: Plaintiffs will fully and adequately protect the interests of the members of the Class and have retained competent class counsel who are experienced and qualified in prosecuting class actions and other forms of complex litigation and intend to prosecute this action vigorously. Neither the Plaintiffs nor their counsel have interests which are contrary to, or conflicting with, those interests of the Class.

194.   Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, *inter alia*: it is economically impracticable for members of the Class to prosecute individual actions; prosecution as a

class action will eliminate the possibility of repetitious and redundant litigation; and, a class action will enable claims to be handled in an orderly, expeditious manner.

195.   Plaintiffs seek certification of a class, alternatively, under Fed. R. Civ. P.23(b)(2) or 23(b)(3), or a combination thereof.

196.   This lawsuit may be maintained as a class action under Federal Rules of Civil Procedure 23(b)(3) because questions of fact and law common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute..  The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices.  Additionally, effective redress for each and every class member against Defendants may be limited or even impossible where serial, duplicated or concurrent litigation occurs arising from these disputes.  Even if individual class member could afford or justify the prosecution of their separate claims, such an approach would compound the judicial inefficiencies, and could lead to incongruous judgments against Defendants.

### Statute of Limitations Estoppel

197.   Throughout the implementation of their fraud and continuing until the present day, Defendants have engaged in affirmative conduct and made representations, including those described herein, with the intent and effect of preventing Plaintiffs and the Class from becoming aware of their rights or otherwise dissuading them from pursuing legal action to vindicate those rights.

198.   Defendants have also actively concealed information necessary for Plaintiffs and the

Class to discover the existence of their cause of action.

199.   As a result of Defendants' self-concealing fraud, affirmative misconduct, misrepresentations and omissions, Plaintiffs and the Class did not know, and could not know in the exercise of reasonable diligence, the basis of their claims.  Accordingly, Defendants are estopped from raising affirmatively defenses relying upon any statutes of limitations or contractual limitation periods otherwise applicable to the claims asserted herein by Plaintiffs.

## COUNT I

### Racketeer Influenced and Corrupt Organizations Act (RICO)

### Violation of 18 U.S.C. §1962(b)

Come now Plaintiffs, individually and on behalf of all others similarly situated, and for their cause of action against Defendants state as follows:

200.   Plaintiffs re-allege and incorporate by reference as if fully set forth herein, each and every allegation contained in paragraphs 1-199 of this Complaint.

201.   ATI, ADS, ADC, and American Capital have violated the civil provisions of the RICO Statue as described below.

202.   Under 18 U.S.C. § 1964(c) "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys' fee…"

203.   Under 18 U.S.C. § 1961(3) a "person" for the purposes of the Civil RICO Statute is defined as "any individual or entity capable of holding a legal or beneficial interest in a property."

204. Under 18 U.S.C. § 1961(4) the term "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

205. ATI is a "person" within the meaning of the RICO Statute.  The association of ATI, ADS, ADC, and American Capital constitute an "enterprise."

206. Under 18 U.S.C. § 1962(b) [I]t is unlawful to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which engages in or affects interstate or foreign commerce through a pattern of racketeering activity or collection of any unlawful debt.

207. Section 1961(1) of RICO Statute defines "racketeering activity" to include any of the enumerated predicate acts listed in section 1961(1).  The list of predicate acts include "extortion", "mail fraud", and "wire fraud."

208. Under 18 U.S.C. § 1951(b)(2) the term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

209. Under 18 U.S.C. § 1341 the term "mail fraud" is defined as whoever, having devised or intending to device any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises…for the purposes of executing such a scheme of artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by

mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing...

210.   Under 18 U.S.C. § 1343 the term "wire fraud" is defined as whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television, communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such a scheme or artifice…

211.   At all times relevant to the claims made herein, AAMCO has acquired and maintained an interest in and control of the enterprise consisting of ATI, ADS, and American Capital and their collusion together, by engaging in the false, fraudulent, and illegal acts set forth above, which took place in interstate commerce, which constituted acts of extortion, wire fraud, and mail fraud by sending misleading and false franchise disclosure documents and other documents through the mails, making false and fraudulent statements via the telephone and otherwise, and using wrongful threats of economic harm to obtain property from franchisees to which AAMCO was not contractually entitled.

212.   The activities of the enterprise of ATI, ADS, ADC, and American Capital constituted a pattern of racketeering in that the activities were both continuous and related.  The false acts were all intended to induce scores of persons to become franchisees of AAMCO, to coerce individual franchisees to pay AAMCO more money than they were obligated to pay under their franchise agreements, and to acquire title to certain failed franchises. Defendants induced many persons to become franchisees under franchise agreements pursuant to which they would continue to pay AAMCO for many years and the scheme

threatens to continue.

213.   Plaintiffs have been injured in their business and property as a result of Defendants'

violations of 18 U.S.C. § 1962(b).  Specifically, Plaintiffs have been deprived of the

amounts they paid to AAMCO pursuant to the franchise agreements and for additional

amounts.  As a direct and proximate result of Defendants' violation of 18 U.S.C. §

1962(b), Plaintiffs have suffered damages in an amount undetermined at this time but in

excess of $75,000.

WHEREFORE, for the foregoing reasons, Plaintiffs, individually and on behalf of all

others similarly situated, pray this Court enter judgment in their favor in Count I of their

Complaint, treble damages, an award of attorneys' fees, their costs herein expended, and for such

other relief the court deems just and proper.  Plaintiffs hereby demand trial of their claims by

jury to the extent authorized by law.

## COUNT II

### Racketeer Influenced and Corrupt Organizations Act (RICO)

### Violation of 18 U.S.C. §1962(c)

Come now Plaintiffs, individually and on behalf of all others similarly situated, and for

their cause of action against Defendants state as follows:

214.   Plaintiffs re-allege and incorporate by reference as if fully set forth herein, each and

every allegation contained in paragraphs 1- 213 of this Complaint.

215.   Under 18 U.S.C. § 1962 (c) it is unlawful for any person to conduct or participate in the

conduct of the affairs of an enterprise that is engaged in or affects interstate or foreign

commerce through a pattern of racketeering activity or collection of unlawful debt.

216.   The AAMCO system constitutes an association-in-fact enterprise under 18 U.S.C.

§1961(4) in that: (a) there is a common and/or shared purpose among the members; (b) there is continuity of structure and personnel; and (c) there is an ascertainable structure distinct from that inherent in the pattern of racketeering.

217. The enterprise is separate and distinct from the individual Defendants that participated in the enterprise and direct its affairs.

218. The structure of the enterprise is imposed by the Franchise Agreements.

219. There are aspects of the operation of this enterprise that do not involve conduct that is intrinsically criminal or illegal.

220. The enterprise affects interstate commerce in a variety of ways including the use of interstate communications to defraud, deceive and threaten Plaintiffs and affect interstate commerce in that the amounts received by AAMCO were based on the sale and purchase of items that crossed state lines.

221. The Defendants conduct the affairs of the enterprise, as opposed to merely their own affairs by, among other things, fraudulently inducing Plaintiffs to enter into franchise agreements.

222. Defendants, including each and every individual Defendant, participated in the conduct of the enterprise through inducing the purchase of franchises by Plaintiffs and all members of the Class, by knowingly disseminating false and fraudulent information contained within the franchise disclosure documents, the franchise agreements and other publicly available resources.

223. Defendants are engaged in an ongoing pattern of racketeering activity as defined by 18 U.S.C. §1961(5).

224. The pattern of racketeering activity of Defendants consists of more than two acts of

racketeering activity, the most recent of which occurred within ten years after the commission of the prior act of racketeering activity.

225.   Defendants have violated and continue to violate 18 U.S.C. §1341 in that defendants: (a) devised a plan to scheme or defraud the franchisees; (b) intended to defraud franchisees, (c) should have reasonably foreseen that the mail would be used; and (4) used the U.S. Postal Service or equivalent private carrier to further the scheme.

226.   Defendants have violated and continue to violate 18 U.S.C. §1343 in that defendants: (a) devised a plan to scheme or defraud the franchisees; (b) intended to defraud franchisees, (c) should have reasonably foreseen that wires would be used; and (4) used wires to further the scheme.

227.   Each violation of 18 U.S.C §1341 and §1343 constitutes an act of racketeering.

228.   The acts of racketeering activity of all Defendants have the same or similar methods.

229.   The acts of racketeering activity committed by all Defendants have the same or similar objective: namely to sell as many franchises as possible to increase the profits of the Defendants.

230.   The acts of racketeering activity committed by all Defendants have the same victims, including Plaintiffs and all other Class Members.

231.   The acts of racketeering activity involving all Defendants involve a distinct threat of long-term racketeering activity.

232.   The practice of Defendants in knowingly and intentionally misrepresenting the true nature of AAMCO system has continued for at least twenty years, is ongoing, and will continue into the future unless halted by judicial intervention.

233.   Defendants' intentional misrepresentation of the true nature of the AAMCO system is

part of the enterprise's regular way of conducting business.

234.   Defendants' pattern of racketeering activity has caused Plaintiffs and all other Members of the Class to invest into a system much different than the system represented to them by Defendants.

235.   Plaintiffs and all other Class Members have suffered an injury to their business and/or property in that as a result of Defendants' violations of 18 U.S.C § 1962(c) in that Plaintiffs/Class Members were fraudulently induced into entering Franchise Agreements as a result of Defendants racketeering activity.

236.   The unlawful conduct of all Defendants has allowed defendants to earn and/or retain significant funds to which they are not entitled, including the amounts paid to AAMCO pursuant to the franchise agreements and for additional amounts.

237.   As a direct and proximate result of AAMCO's violations of 18 U.S.C. 1962(c), Plaintiffs have suffered damages in an amount undetermined at this time but in excess of $75,000.

   WHEREFORE, for the foregoing reasons, Plaintiffs, individually and on behalf of all others similarly situated, pray this Court enter judgment in their favor in Count II of their Complaint, treble damages, an award of attorneys' fees, their costs herein expended, and for such other relief the court deems just and proper.  Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

## COUNT III

### Racketeer Influenced and Corrupt Organizations Act (RICO)

### Violation of 18 U.S.C. §1962(d)

   Come now Plaintiffs, individually and on behalf of all others similarly situated, and for their cause of action against Defendants state as follows:

238.   Plaintiffs re-allege and incorporate by reference as if fully set forth herein, each and
       every allegation contained in paragraphs 1- 237 of this Complaint.

239.   Under 18 U.S.C. § 1962(d) it is unlawful for any person to conspire to violate any of the
       provisions of subsection (a), (b), or (c) of this section.

240.   As set forth in Count I and Count II, Defendants agreed and conspired to violate 18
       U.S.C. §1962(d).  Specifically, Defendants engaged in a willful pattern and practice of
       misrepresenting the AAMCO system in order to fraudulently induce Plaintiffs and
       Members of the Class into entering Franchise Agreements.

241.   The Defendants have intentionally conspired to conduct and participate in the conduct of
       the affairs of the enterprise through a pattern of racketeering activity.

242.   Defendants knew that their predicate acts were part of a pattern of racketeering activity
       and agreed to the commission of those acts to further the schemes aforementioned
       schemes in violation of 18 U.S.C. §1962(d).

243.   As a direct and proximate result of the Defendants conspiracy, the overt acts taken in
       furtherance of that conspiracy, and violations of 18 U.S.C. §1962(d), Plaintiffs and
       Members of the Class have been injured in their business and property in that Plaintiffs
       were fraudulently induced into entering Franchise Agreement as a result of Defendants
       racketeering activity.

244.   Specifically, Plaintiffs have been deprived of the amount of money that AAMCO has
       obtained unlawfully by reason of the conspiracy.

245.   As a direct and proximate result of AAMCO's violations of 18 U.S.C. § 1962(d),
       Plaintiffs have suffered damages in an amount undetermined at this time but in excess of
       $75,000.

WHEREFORE, for the foregoing reasons, Plaintiffs, individually and on behalf of all others similarly situated, pray this Court enter judgment in their favor in Count III of their Complaint, treble damages, an award of attorneys' fees, their costs herein expended, and for such other relief the court deems just and proper.  Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

Respectfully submitted,

LAW OFFICE OF JONATHAN E. FORTMAN, LLC


By    _____/s/_____
      Jonathan E. Fortman #40319
      Attorney for Plaintiffs/Putative Class Members
      Lead Counsel
      250 Saint Catherine Street
      Florissant, MO  63031
      (314) 522-2312
      (314) 524-1519 Fax
      jef@fortmanlaw.com